IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| DOUGLAS E. REUTER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Case No. 4:07-CV-26 |
| | § | |
| JAX, LTD, INC., | § | |
| | § | |
| Defendant. | § | |

**MEMORANDUM OPINION AND ORDER GRANTING
DEFENDANT'S MOTION TO TRANSFER VENUE**

Pending before the court is the Defendant's "Motion and Brief in Support of Motion to Dismiss for Lack of Jurisdiction and Venue, or in the Alternative, to Transfer Venue" (docket entry #7). After considering the Defendant's motion, the Plaintiff's response in opposition (docket entry #11), the Plaintiff's amended response in opposition (docket entry #12) and the Defendant's reply thereto (docket entry #13), the court is of the opinion that the Defendant's motion to transfer venue should be granted and this case should be transferred. Therefore, the court hereby ORDERS that this case be transferred to the United States District Court for the District of Minnesota.

**I.  BACKGROUND**

The Plaintiff ("Reuter") and the Defendant ("Jax") have been embroiled in litigation in the United States District Court for the District of Minnesota. *See Jax Ltd., Inc. v. Douglas E. Reuter*, Civil No. 05-2658 (D. Minn.) (Frank, J.). The Minnesota court related the factual background of this case as follows in its Memorandum Opinion and Order granting in part and denying in part Jax's

motion for a temporary restraining order:[1]

  Jax is a Minnesota corporation that develops, manufactures, sells, and distributes family games. Reuter invented a game called "Sequence Five." In 1981, Jax and Reuter entered [into] a license agreement (the "Agreement") that gave Jax the exclusive right to manufacture, distribute, and sell "Sequence Five." The Agreement is automatically renewed each year provided that Reuter is paid $2,500 minimum annual royalties. The Agreement has been renewed every year since the parties signed it. The Agreement requires Jax to "make reasonable efforts to manufacture, distribute and sell the Licensed [P]roduct." The Agreement also requires Reuter to "fully cooperate with [Jax] in the manufacture, distribution and sale of the Licensed Product." In addition, the Agreement provides that Reuter may terminate the Agreement if Jax does not cure any performance default within 30 days after notice of such default from Reuter.

  After signing the Agreement, Sequence Five was renamed "Sequence®." Jax alleges that retailers such as Target and Wal-Mart declined to sell Sequence® in the early 1980s. According to Jax, it continued to lobby major retailers, but invested substantial amounts of time, effort, and money to build a sales network of independent game retailers, specialty stores, and regional chains. Jax also contends that it expanded this network by marketing Sequence® through advertising, national trade shows, trade association activities, and in-store demonstrations.

  In 1991, after years of lobbying, Jax convinced Target to sell Sequence® on a trial basis. Jax alleges, however, that Target threatened to cancel its plan to sell Sequence® after Reuter independently contacted and pressured a Target store manager about the game. Jax alleges that it alleviated Target's dissatisfaction with Reuter's behavior and that Target has sold Sequence® since 1991. Jax also alleges that it allayed the fears of independent game retailers, specialty stores, and regional chains that Target's sales would interfere with their own. Jax also currently sells Sequence® to Mills Fleet Farm and K-Mart.

  Additionally, around 1991, Jax alleges that it received a call from another game company that stated Reuter had contacted it about manufacturing and selling Sequence®. The company indicated that Reuter represented that he would soon recover the licensing rights to the Sequence® game because Jax was in default under the Agreement. Jax, however, alleges that Reuter did not make a similar representation to it at that time. Jax indicates that these actions, among others, led to the "Amendment No. 1" to the Agreement, which represented a "compromise of disputed issues between the parties."

---

[1] Internal citations have been omitted.

>Jax expanded the Sequence® Brand by creating alternative versions of Sequence®. Jax developed a travel version of Sequence® in 1994, a Sequence® dice game in 1999, and a Sequence® game for children in 2001. Jax alleges that Reuter refused to assist Jax with the development of these games, but that Jax nonetheless paid Reuter royalties on these games. Jax also paid Reuter royalties on deluxe, jumbo, and multi-lingual versions of Sequence®, as well as versions packaged in both boxes and tins that Jax developed. Additionally, Jax paid Reuter royalties on promotional items with the Sequence® name, such as tee shirts, even though the Agreement does not provide for such royalties.
>
>Jax also expanded the distribution of Sequence® products. In 1997, Jax negotiated a sublicense agreement with Hasbro, one of the world's largest toy and game retailers, to carry the Sequence® product line outside the United States. In 2004, Jax negotiated an agreement with a distributor to sell Sequence® products in Mexico. Jax has also established distributorships in Canada.
>
>These efforts have enabled Jax to grow its annual sales of Sequence® products. In 2004, the annual sales topped $5,000,000. Reuter has received annual royalties exceeding $200,000 every year since 1995, and in five of the last seven years Reuter's royalties have exceeded $300,000. To date, Jax has paid Reuter more than $3,000,000 in royalties. The sales of Sequence® products constitute 80 percent of Jax's annual revenue.
>
>On November 7, 2005, Reuter's attorney sent a letter to Jax, alleging that Jax had materially breached the Agreement by refusing to sell Sequence® products to Wal-Mart. The letter states that if the breach is not cured within 30 days, Reuter will terminate Jax's license. Jax maintains that it exercised sound and reasonable business judgment by declining to sell Sequence® products at Wal-Mart, as it believes that retailing its products through Wal-Mart will cause Jax's other retailers to cease carrying its products. Jax also contends that its network of independent retailers and specialty stores believes Wal-Mart displaces independent retailers. Furthermore, Jax contends that Wal-Mart's image and market positions are incompatible with its own.

*Jax Ltd., Inc. v. Douglas E. Reuter*, Civil No. 05-2658 (D. Minn. November 28, 2005), pp. 2-5.

In an effort to resolve the above-referenced disputes in the Minnesota lawsuit, the parties attended a settlement conference on April 12, 2006. At the conclusion of the settlement conference, the parties reached an agreement which was memorialized on the record as follows:

>MR. WEINSTINE: Thank you, Your Honor. The record should reflect that

after today's settlement conference and with the assistance of Your Honor, the parties have agreed to settle the above-captioned litigation as follows.

First, the lawsuit will be dismissed with prejudice, and mutual releases will be exchanged.

Second, with respect to any future disputes which may or might arise with respect to the license arrangement, before suit can be initiated the parties must first have a meet and confer. Thereafter no lawsuit can be filed for a period of 30 days, measured from the date of the meet and confer, unless one of the parties is in need of injunctive relief. If suit is initiated, the party that brings the lawsuit, if they lose, will bear the fees of the other party, and this shall be the case in all actions, save for a declaratory judgment action.

The parties have further agreed that, save as hereinafter delineated with greater particularity, the defendant Reuter will not sell the Sequence game to anyone other than consumers only through one website and/or store. There will be no bulk sales in excess of 12 games per month per customer. There will be no royalties to be paid to Mr. Reuter on sales of the product in excess of 10,000 units per year. Mr. Reuter can only purchase his product from Jax. Mr Reuter will pay the same price as other purchasers from Jax who purchase at comparable volume. Mr. Reuter is free to sell the product at such price as he may deem exclusively satisfactory.

The parties further agree that Jax will not sell to Wal-Mart without the written express approval of the defendant Reuter, and refusal by Mr. Reuter to accept the terms and conditions of sale to Wal-Mart shall not be construed as a breach of his cooperation clause.

Lastly, the parties agree that all licensed products shall be of high quality and that it is at least comparable to products manufactured and marketed by the licensee. The licensor has the final control to decide the level of quality for the licensed product and hereby assigns the final control of the licensed product quality to the licensee for the term of this agreement. Upon termination of the agreement the licensee shall forthwith assign to the licensor all of its rights, title, goodwill and interest in and to any United States or foreign trademarks, copyrights, artwork, patent applications or letters patent.

And I believe that sets forth the terms and conditions – yes, that – I would indicate that when I indicated that Mr. Reuter can sell either through one website or one store, the store would be owned by Mr. Reuter in his individual capacity or a corporation that he is the sole shareholder of.

───────────────────────────

>    MR. BIASCO:  Your Honor, the only clarification would be that Mr. Reuter would ask that the ownership of the store, he said exclusively to Mr. Reuter, he'd like to also have his wife listed as a possible owner.
>
>    MR. WEINSTINE:  No objection, Your Honor.

Def. Mtn. to Transfer Venue, Exh. 1G (Tr. of Settlement Conference), pp. 4-7.

On the following day, April 13, 2006, the Minnesota court dismissed the case with prejudice, "reserving jurisdiction for ninety (90) days to permit any party to move to reopen the action, for good cause shown, or to submit and file a stipulated form of final judgment, or to seek enforcement of the settlement terms." *Jax Ltd., Inc. v. Douglas E. Reuter*, Civil No. 05-2658 (D. Minn. April 13, 2006) (docket entry #50). Thereafter, Jax attempted to reduce the terms of the settlement agreement which were announced on the record at the settlement conference into a written document. Def. Mtn. to Transfer Venue, Exh. 2, pp. 1-2, ¶ 3 (Decl. of Matthew Spohn). The parties were ultimately unable to reach an agreement. *Id*. at p. 2.

However, rather than returning to the Minnesota court for direction, Reuter filed a declaratory judgment action in this court. Reuter seeks the following declarations from this court:

>    1.   "Reuter may not be prohibited from promoting Sequence or any licensed Sequence products associated with it; from advertising Sequence; from making personal appearances on behalf of Sequence; or from communicating, by any other possible means, the fact that Reuter is the inventor of Sequence."; and
>
>    2.   "Reuter further seeks a declaration, pursuant to 28 U.S.C. Section 2201(a), that Reuter may buy from Jax an unlimited number of Sequence and other licensed Sequence products at the same wholesale price and terms provided to any other customer of comparable volume, and that the resale price set by Reuter shall be at the complete discretion of Reuter."

Pl. Orig. Comp., pp. 3-4, ¶¶ 11-12. Jax now seeks a dismissal of Reuter's lawsuit due to lack of personal jurisdiction and improper venue. Alternatively, Jax moves for a transfer of this case to the

United States District Court for the District of Minnesota. Without determining whether this court has personal jurisdiction over Jax, the court finds that the transfer of this case to Minnesota is appropriate. *See PaineWebber Inc. v. Chase Manhattan Private Bank (Switzerland)*, 260 F.3d 453, 460 n.7 (5th Cir. 2001) ("In any event, a motion for transfer is fully consistent with an objection to personal jurisdiction, as a court may transfer a case even though it lacks personal jurisdiction.").

## II.  DISCUSSION

### A. LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where [the case] might have been brought." 28 U.S.C. § 1404(a) (2000). For a section 1404(a) transfer to be proper, "the first determination to be made is whether the judicial district to which transfer is sought would have been a district in which the claim could have been filed." *In re Volkswagon AG*, 371 F.3d 201, 203 (5th Cir. 2004). Venue must be proper in the transferee court and the transferee court must have personal jurisdiction over the defendant. *Houston Trial Reports, Inc. v. LRP Publ'ns, Inc.*, 85 F. Supp. 2d 663, 667 n.1 (S.D. Tex. 1999).

"A motion to transfer under § 1404(a) [] calls on the district court to weigh in the balance a number of case-specific factors." *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). "The court should balance two categories of interest in determining whether to transfer venue: (1) the convenience of the litigants, and (2) the public interests in the fair and efficient administration of justice." *Hanby v. Shell Oil Co.*, 144 F.Supp.2d 673, 676 (E.D. Tex. 2001). The convenience factors are as follows:

(1) The plaintiff's choice of forum;

  (2)  The convenience of the parties and witnesses;

  (3)  The place of the alleged wrong;

  (4)  The cost of obtaining the attendance of witnesses;

  (5)  The accessibility and location of sources of proof; and

  (6)  The possibility of delay and prejudice if transfer is granted.

*Id*. at 676-77.

The public interest factors are as follows:

  (1)  The administrative difficulties caused by court congestion;

  (2)  The local interest in adjudicating local disputes;

  (3)  The unfairness of burdening citizens in an unrelated forum with jury duty; and

  (4)  The avoidance of unnecessary problems in conflict of laws.

*Id*. at 677.

The party who files a motion to change venue under section 1404(a) bears the burden of proving why venue should be changed. *See Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989). "To prevail, the litigant must demonstrate that the balance of convenience and justice *substantially* weighs in favor of transfer." *Mohamed v. Mazda Motor Corp.*, 90 F. Supp. 2d 757, 768 (E.D. Tex. 2000) (citation omitted). "The court should not transfer venue where the result will be merely to shift the expense and inconvenience from one party to the other." *Enserch Int'l Exploration, Inc. v. Attock Oil Co., Ltd.*, 656 F. Supp. 1162, 1167 n.15 (N.D. Tex. 1987) (citation omitted). The district court's decision to grant or deny a motion to transfer under section 1404(a) will be reversed only for an abuse of discretion. *In re Horseshoe Entm't*, 337 F.3d 429, 432 (5th Cir. 2003).

B. ANALYSIS

### 1. The Propriety of Jax's Motion to Transfer

The first issue is whether Jax's motion to transfer satisfies the condition that the transferee court must be a "district or division where [the case to be transferred] might have been brought." § 1404(a). Here, the parties do not dispute that this action could have been brought in the District of Minnesota. Accordingly, the court shall now turn to whether the convenience and public interest factors substantially weigh in favor of transfer.

### 2. The Merits of Jax's Motion to Transfer

Neither Jax nor Reuter performed an in-depth analysis of the factors involved in determining a motion to transfer venue. Jax argues that it would suffer a greater inconvenience if it was forced to try this lawsuit in Texas than if Reuter was forced to try this lawsuit in Minnesota. Jax points out that no representative of Jax has ever traveled to Texas to meet with Reuter; Jax has no offices, books or records in Texas; all of Jax's employees who could be witnesses herein reside in Minnesota; and any sources of proof are located at Jax's headquarters in Minnesota. Jax further argues that a transfer of this case will not result in any prejudice or undue delay since this case is still in its infancy. Finally, Jax notes that the parties were previously engaged in litigation in Minnesota. Accordingly, Jax reasons that since the Minnesota court is already familiar with the parties, the License Agreement and the prior settlement agreement, transferring this case to Minnesota will promote judicial efficiency.

In contrast, Reuter argues that Minnesota is not a more convenient forum. Reuter contends that it is just as convenient for Jax to fly to Texas as it is for Reuter to fly to Minnesota. Additionally, Reuter argues that the relief sought in his lawsuit has a significant impact on Texas

commerce because Jax is prohibiting Reuter, a Texas resident, from engaging in permitted activities in Texas. Finally, Reuter notes that the court herein will only be required to review the License Agreement and its amendments to interpret the parties' agreement.

After reviewing the prior Minnesota litigation in conjunction with the instant lawsuit, the court concludes that judicial economy necessitates a transfer of this case to Minnesota. It is significant to note that the declaration sought by Reuter in this court, at least in part, is actually a clarification of the parties' prior settlement agreement. The court declines Reuter's invitation to impose judgment on issues that fall within the purview of the Minnesota court. Accordingly, transferring this case to the District of Minnesota promotes judicial economy and is clearly in the interest of justice.

### III. CONCLUSION

Based on the foregoing, the court concludes that this case should be transferred. Accordingly, the Defendant's "Motion and Brief in Support of Motion to Dismiss for Lack of Jurisdiction and Venue, or in the Alternative, to Transfer Venue" (docket entry #7) is **GRANTED IN PART**. Therefore, the court hereby **ORDERS** that this case be **TRANSFERRED** to the District of Minnesota. The Defendant's request for a hearing (docket entry #7) is **DENIED**.

IT IS SO ORDERED.

**SIGNED this the 27th day of September, 2007.**

_Richard A. Schell_
RICHARD A. SCHELL
UNITED STATES DISTRICT JUDGE